**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
BALTIMORE DIVISION**

| | |
|---|---|
| TRADEPOINT MARINE DEVELOPMENT, LLC, <br> 6995 Bethlehem Blvd. <br> Sparrows Point, MD 21219 <br><br>          Plaintiff, <br><br> v. <br><br> BRUKS SIWERTELL, INC. d/b/a BRUKS SIWERTELL AMERICAS AND BRUKS SIWERTELL, LLC, <br> 5975 Shiloh Rd., Ste. 109 <br> Alpharetta, GA 30005 <br><br>          Defendant. | Case No. _____ |

## **COMPLAINT**

Plaintiff Tradepoint Marine Development, LLC ("TMD" or "Plaintiff"), by and through its undersigned attorneys, brings this Complaint for damages against Defendant Bruks Siwertell, Inc. d/b/a Bruks Siwertell Americas and Bruks Siwertell, LLC ("Bruks" or "Defendant"), and alleges as follows:

## **NATURE OF THE ACTION**

1. This breach of contract action arises out of Defendant's design, fabrication, and delivery of a fundamentally defective and inoperable Material Handling System ("MHS") in violation of a Purchase Order, and the documents referenced, attached or otherwise incorporated therein, as amended (the "Agreement" or the "Contract") between the parties.

2.     Under the Agreement, Bruks agreed to properly design, manufacture, deliver, test, and commission a functional MHS capable of handling various materials for TMD's bulk terminal facility at Sparrows Point, Maryland, for a total contract price of approximately $9.85 million.

3.     Bruks failed to deliver what it promised.  Instead, TMD is left with a machine for which it bargained to pay $9.85 million, but which is fundamentally defective, sits idle in its lot, and serves no functional purpose.

4.     TMD brings this action to recover damages caused by Bruks's breaches, including the costs of correcting, repairing, replacing, and retesting the unusable MHS; delay damages; enforcement of deductive change orders totaling $430,520.33; and contractual indemnity.

## PARTIES, JURISDICTION, AND VENUE

5.     Plaintiff Tradepoint Marine Development, LLC is a Delaware limited liability company with its principal place of business in Baltimore, Maryland.  For purposes of diversity jurisdiction, TMD is a citizen of Maryland, the District of Columbia, Florida, and Pennsylvania.

6.     On information and belief, Defendant Bruks Siwertell, Inc. d/b/a Bruks Siwertell Americas and Bruks Siwertell, LLC is a corporation formed under the laws of the State of Georgia, with its principal office in Alpharetta, Georgia, and is therefore a citizen of Georgia for purposes of diversity jurisdiction.

7.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendant and the amount in controversy exceeds $75,000, exclusive of interest and costs.

8.     Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District, including the delivery and installation of equipment at TMD's Sparrows Point, Maryland facility.

9.      Venue is also proper under the parties' contractual forum-selection clause.  Section 17 of the Agreement provides that Bruks "consents to exclusive jurisdiction and venue of the Federal and state courts located in the state of Maryland."

10.      This Court has personal jurisdiction over Bruks based on its consent to jurisdiction in Maryland courts under the Agreement's forum-selection clause and based on Bruks's transaction of business within this State.

## FACTUAL ALLEGATIONS

11.      TMD owns and operates facilities at Tradepoint Atlantic, a 3,300-acre intermodal logistics and industrial park located at Sparrows Point in Baltimore County, Maryland.

12.      Bruks is a designer and manufacturer of material handling systems, including systems for bulk terminal operations.

### The Agreement

13.      On or about June 7, 2024, TMD issued a Purchase Order to Bruks for the design, manufacture, and delivery of a Material Handling System for TMD's Finger Pier facility at Sparrows Point, Maryland.

14.      TMD contracted for the MHS to support its bulk-terminal operations by moving heavy dry bulk materials through the facility, including from intake points, through conveyors and transfer points, and ultimately to loading operations.

15.      On or about June 7, 2024, the parties executed an Addendum to that Purchase Order, which amended and supplemented the parties' obligations for the project.

16.      Pursuant to the Agreement, Bruks contracted to properly design, manufacture, and deliver the material handling system, and the Agreement expressly recognizes that TMD relied on Bruks as a design professional.  A true and correct copy of the Agreement is attached hereto as Exhibit 1.

3

**Key Provisions**

17.     Section 7 of the Purchase Order incorporated into the Agreement provides that TMD has a reasonable opportunity to inspect Deliverables after delivery and that no acceptance is deemed until after reasonable inspection.  Section 7 further provides that TMD may revoke acceptance of commercial lots later found defective, and upon rejection or revocation, Bruks must promptly replace or correct unsatisfactory units at TMD's option and Bruks's expense, including shipping costs. Ex. 1 (Agreement), Ex. A (Purchase Order) § 7.

18.     Section 8 provides that Bruks shall perform the Work in accordance with the Agreement and industry standards, that TMD relies on Bruks as a design professional, and that Bruks remains fully responsible for the Work notwithstanding any review or acceptance by TMD. *Id.* § 8.

19.     Section 9 provides that Bruks warrants the Deliverables will be: (i) provided competently and professionally and in accordance with industry standards; (ii) free from defects in materials and workmanship; (iii) merchantable and fit for their particular purpose; (iv) conforming to and performing in accordance with specifications, drawings, samples, and requirements provided by Bruks; (v) free of liens, security interests, and encumbrances; and (vi) compliant with applicable laws and regulations. *Id.* § 9.

20.     Section 12 provides that Bruks shall indemnify TMD, to the pro rata extent caused by Bruks, against first or third party liabilities, costs, losses, or expenses, including reasonable attorneys' fees, incurred or suffered as a result of or in connection with Bruks's action or inaction related to the subject matter of the Agreement. *Id.* § 12.

21.     Section 13 provides that Bruks is required to secure and maintain, at its own expense, professional errors and omissions insurance in the amount of $5,000,000 per claim and $5,000,000 annual aggregate for the duration of the Agreement and for three years following its

completion or termination. Section 13 further provides that Bruks is required to provide certificates of insurance before delivery of any Deliverables, and that TMD's receipt or acceptance of noncompliant certificates would not waive Bruks's insurance obligations. *Id.* § 13.

22.     The Agreement's specifications further provide that final completion and commercial operation require successful commissioning and acceptance testing, and that warranty obligations include design, engineering, materials, workmanship, operability, and correction or replacement at supplier/contractor expense. Ex. 1 (Agreement), Ex. 6 (Request for Proposal SPE-1010) §§ 2.4-2.6.

**Defendant's Breach**

23.     The Agreement required Bruks to properly design, fabricate, deliver, and test conforming equipment capable of handling highly abrasive and/or corrosive commodities such as slag, pumice, salt, bauxite, gypsum, aragonite, raw perlite, copper slag, urea, potash, lightweight aggregate, sand/aggregate, and scour rock. Ex. 1 (Agreement), Ex. 2 (General Technical Specification) § 1.1.

24.     The Agreement also warranted that the Deliverables would be free from defects and fit for their particular purpose. Ex. 1 (Agreement), Ex. A (Purchase Order) § 9.

25.     In violation of the Agreement's express terms and fundamental purpose, Bruks delivered equipment plagued by fundamental design defects, out-of-tolerance fabrication, nonconforming components, and missing items.

26.     During initial operational testing, while handling slag (one of the materials specifically called out in the Agreement as required to be properly and safely handled), the Material Handling System's liners and other components immediately and catastrophically failed. *See* Ex. 1 (Agreement), Ex. 2 (General Technical Specification) § 1.1.

27.     The MHS offloaded less than 26,000 tons before it became inoperable, a fraction of the 5.0 million short tons per annum the Agreement projected for design purposes. *See* Ex. 1 (Agreement), Ex. 4 (Request for Proposal) § 3.8(a).

28.     In addition to delivering a fundamentally defective system, Bruks also delivered the MHS several months late, despite the Agreement's express provision that time is of the essence. *See* Ex. 1 (Agreement), Ex. A (Purchase Order) § 15.

29.     TMD repeatedly notified Bruks during the delivery and erection of the MHS that certain Deliverables were defective, misfabricated, missing, or otherwise nonconforming, and demanded correction or replacement at Bruks's sole cost and expense.

30.     Despite TMD's repeated efforts to work with Bruks to resolve the issues during the delivery and erection of the MHS, Bruks continued to send nonconforming parts, resulting in additional cost and delay.

31.     Under the Agreement, Bruks was solely responsible for all engineering, design, fabrication, and materials selection, including selecting liner materials capable of withstanding the corrosive and abrasive materials the system would handle.

32.     Bruks also was responsible for designing and providing a fully operational, code- and specification-compliant material handling system and for advising the Owner of optional or alternative items and designs that improve safety, efficiency, availability, reliability, throughput, functionality, cost, or operation.

33.     TMD relied on Bruks's experience in designing and manufacturing similar systems in allowing Bruks to make the final liner material and design selections.

6

34.    Bruks refuses to fix the MHS to correct the fundamental design flaws, refuses to ensure the MHS complies with the requirements of the Agreement, refuses to correct or replace the nonconforming deliverables, and refuses to pay the delay damages.

35.    Bruks's failure to deliver conforming equipment, defective design and fabrication, late delivery, refusal to correct or replace nonconforming Deliverables, refusal to correct fundamental design flaws, refusal to execute deductive change orders, refusal to pay delay damages, as well as other actions and omissions by Bruks, constitute past, present, and ongoing material breaches of the Agreement.

36.    Upon information and belief, Bruks further breached the Agreement by failing to procure, maintain, and/or provide the errors and omissions insurance required by Section 13 of the Agreement.

37.    Bruks is separately obligated under Section 12 of the Agreement to indemnify TMD for its first party liabilities, costs, losses, and expenses, including reasonable attorneys' fees, caused by Bruks's acts or omissions in connection with the Agreement, including those incurred in connection with this dispute/litigation.

38.    As a result of Bruks's breaches, TMD seeks the contractual remedies available under the Agreement, including: (i) payment of direct damages, including costs of correction, design, fabrication, repair, replacement, retesting, warranty and default remedies, and delay damages; (ii) enforcement of the deductive change orders totaling $430,520.33; (iii) contractual indemnification for all liabilities, costs, losses, and expenses incurred by TMD as a result of Bruks's acts or omissions, including attorneys' fees; (iv) the cost of engaging TMD's own engineer and others to remedy the deficiencies in the existing MHS; and (v) all other relief the Court deems just and proper.

## COUNT I

### Breach of Contract

39.     TMD incorporates by reference the allegations in Paragraphs 1 through 38 as if fully set forth herein.

40.     The Agreement constitutes a binding and enforceable contract between TMD and Bruks.

41.     TMD performed its obligations under the Agreement, including by making payments to Bruks notwithstanding that all items had not yet been accepted and delivery was not complete and has otherwise fulfilled all conditions precedent, if any.

42.     Bruks materially breached and is materially breaching the Agreement by, inter alia:

1) Delivering an inadequate and defective design as well as out-of-tolerance, nonconforming, and defective equipment;

2) Failing to furnish Deliverables free from defects in materials and workmanship;

3) Failing to perform the Work in accordance with applicable design and industry standards;

4) Making design errors and omissions;

5) Failing to deliver Deliverables conforming to requirements, specifications, drawings, and requirements;

6) Failing to meet delivery dates;

7) Failing to promptly replace or correct nonconforming and inadequate deliverables at Defendant's expense;

8) Failing to procure, maintain, and/or provide errors and omissions insurance in the amounts required; and

9) Failing to remedy the above breaches at its sole cost and expense.

43. As a direct and proximate result of Bruks's material breaches, TMD has suffered and continues to suffer damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tradepoint Marine Development, LLC respectfully requests that this Court enter judgment in its favor and against Defendant, and award the following relief:

i. Enter judgment in TMD's favor;

ii. Payment of damages, including damages associated with Bruks's failure to deliver conforming equipment, defective design and fabrication, and late delivery, as well as costs of correction, repair, replacement, retesting, warranty and default remedies, and delay damages, in an amount to be determined at trial, but no less than $2,000,000;

iii. An order enforcing the $430,520.33 in deductive change orders that Bruks has refused to sign;

iv. Contractual indemnification for all past, current and future liabilities, costs, losses, and expenses, including reasonable attorneys' fees and costs incurred and to be incurred by TMD in connection with Bruks's various breaches of the Agreement and this action; for peer reviewers, design firms, or other third parties engaged to assess or repair the MHS, incurred or suffered by TMD as a result of or in connection with Bruks's acts or omissions relating to the Agreement, including in or in connection with this matter;

v. Pre-judgment and post-judgment interest, costs of suit, and all other relief available under the Agreement, Maryland law, and any other applicable law; and

vi.   Such other and further relief as this Court deems just and proper.

Dated:  July 13, 2026

/s/ David L. Feinberg
David L. Feinberg, Esq. (Bar No. 28376)
Venable LLP
600 Massachusetts Avenue, NW
Washington, DC 20001
Telephone: 202.344.8278
Facsimile: 202.344.8300
Email: dlfeinberg@Venable.com

*Counsel for Plaintiff Tradepoint Marine Development, LLC*